IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BURBACH AQUATICS, INC., as Successor        )
to David F. Burbach, d/b/a Burbach Municipal )
& Civil Engineers,                          )
                                            )
          Plaintiff,                        )          **FILED: JULY 17, 2008**
                                            )          **08CV4061**
V.                                          )   NO.    **JUDGE DOW**
                                            )          **MAGISTRATE JUDGE DENLOW**
THE CITY OF ELGIN, ILLINOIS,                )          **AEE**
A Municipal Corporation,                    )
                                            )
          Defendant.                        )

## COMPLAINT AT LAW

Plaintiff, Burbach Aquatics, Inc., as successor to David F. Burbach, d/b/a Burbach Municipal & Civil Engineers ("BAI"), for its Complaint against Defendant, the City of Elgin, Illinois ("Elgin"), states and alleges as follows:

1.    BAI is a corporation organized under the laws of the State of Wisconsin, and is engaged in business as an architectural and engineering firm specializing in the design of aquatic facilities.  At all times material herein, BAI and/or its principal, David F. Burbach, was properly licensed and authorized to practice engineering and architecture in the State of Illinois.

2.    Elgin is a municipal corporation organized and existing under the laws of the State of Illinois and located in Kane County, Illinois.

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    Venue in this District and Division is proper under 28 U.S.C. § 1391(a) because the defendant resides, and a substantial part of the events giving rise to this action occurred, in this District and Division.

5.    On or about March 8, 1995, BAI's predecessor in interest, David F. Burbach, d/b/a Burbach Municipal and Civil Engineers, entered into a written contract whereby BAI agreed to provide, and Elgin agreed to pay for, engineering services for the renovation and/or replacement of Elgin's municipal pools and bathhouses at Lord's Park and Wings Park (the "Contract"). See Exhibit A.

6.    BAI provided the services required by the Contract, and performed all conditions precedent to receiving payment under the Contract.

7.    Elgin breached the Contract by failing and refusing to pay BAI the sum of $135,559.72, plus interest at the rate of 18% per annum.

8.    As a direct result of Elgin's breach, BAI has been damaged in the sum of $135,559.72, plus interest at the rate of 18% per annum.

WHEREFORE, Burbach Aquatics, Inc. demands judgment against Elgin in the sum of $135,559.72, plus interest at the rate of 18% per annum. Plus its costs and disbursements incurred herein.

Dated:  July 16, 2008

                                                Burbach Aquatics, Inc., Plaintiff


                                                By:  _____/s/ Lisa M. Fontoura_____
                                                        One of its Attorneys

Fred E. Schulz  (2516500)
Lisa M. Fontoura  (6273876)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 201-2000 / Fax: (312) 201-2555

1893947                                          2

*Curtis D. Smith (102313)
Moss & Barnett
A Professional Association
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-4129
(612) 877-5285 / Fax: (612) 877-5999

*Attorneys for Plaintiff Burbach Aquatics, Inc.*

* Application for admission *pro hac vice* pending

# EXHIBIT   A



*AIA Document B141*

# Standard Form of Agreement Between Owner and Architect

## 1987 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

## AGREEMENT

made as of the ****Eighth  ************* day of ****March  ************* in the year of Nineteen Hundred and Ninety Five*******(1995)

**BETWEEN** the Owner:
*(Name and address)*
City of Elgin, Illinois, a municipal corporation (hereinafter referred to as "owner")
Elgin Parks and Recreation Department
31 Fountain Square
Elgin, Illinois  60120
and the Architect:
*(Name and address)*

David F. Burbach, dba
Burbach Municipal and Civil Engineers
5974 State HIghway 80 South, P.O. Box 721, Platteville, WI  53818
For the following Project:
*(Include detailed description of Project, location, address and scope.)*
Renovation and/or replacement of the Owner's municipal swimming pools and bathhouses at Lords and Wings Park in the City of Elgin, County of Kane, State of Illinois.

                              Now, therefore, for and in consideration
of the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged,

The Owner and Architect agree as set forth below.

Copyright 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, © 1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C. 20006. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecution.



## TERMS AND CONDITIONS OF AGREEMENT BETWEEN OWNER AND ARCHITECT

### ARTICLE 1
### ARCHITECT'S RESPONSIBILITIES

#### 1.1 ARCHITECT'S SERVICES

**1.1.1** The Architect's services consist of those services performed by the Architect, Architect's employees and Architect's consultants as enumerated in Articles 2 and 3 of this Agreement and any other services included in Article 12.

**1.1.2** The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Work. Upon request of the Owner, the Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which may be adjusted as the Project proceeds, and shall include allowances for periods of time required for the Owner's review and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.

**1.1.3** The services covered by this Agreement are subject to the time limitations contained in Subparagraph 11.5.1.

### ARTICLE 2
### SCOPE OF ARCHITECT'S BASIC SERVICES

#### 2.1 DEFINITION

**2.1.1** The Architect's Basic Services consist of those described in Paragraphs 2.2 through 2.6 and any other services identified in Article 12 as part of Basic Services, and include normal structural, mechanical and electrical engineering services.

#### 2.2 SCHEMATIC DESIGN PHASE

**2.2.1** The Architect shall review the program furnished by the Owner to ascertain the requirements of the Project and shall arrive at a mutual understanding of such requirements with the Owner.

**2.2.2** The Architect shall provide a preliminary evaluation of the Owner's program, schedule and construction budget requirements, each in terms of the other, subject to the limitations set forth in Subparagraph 5.2.1.

**2.2.3** The Architect shall review with the Owner alternative approaches to design and construction of the Project.

**2.2.4** Based on the mutually agreed-upon program, schedule and construction budget requirements, the Architect shall prepare, for approval by the Owner, Schematic Design Documents consisting of drawings and other documents illustrating the scale and relationship of Project components.

**2.2.5** The Architect shall submit to the Owner a preliminary estimate of Construction Cost based on current area, volume or other unit costs.

#### 2.3 DESIGN DEVELOPMENT PHASE

**2.3.1** Based on the approved Schematic Design Documents and any adjustments authorized by the Owner in the program,

schedule or construction budget, the Architect shall prepare, for approval by the Owner, Design Development Documents consisting of drawings and other documents to fix and describe the size and character of the Project as to architectural, structural, mechanical and electrical systems, materials and such other elements as may be appropriate.

**2.3.2** The Architect shall advise the Owner of any adjustments to the preliminary estimate of Construction Cost.

#### 2.4 CONSTRUCTION DOCUMENTS PHASE

**2.4.1** Based on the approved Design Development Documents and any further adjustments in the scope or quality of the Project or in the construction budget authorized by the Owner, the Architect shall prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project.

**2.4.2** The Architect shall assist the Owner in the preparation of the necessary bidding information, bidding forms, the Conditions of the Contract, and the form of Agreement between the Owner and Contractor.

**2.4.3** The Architect shall advise the Owner of any adjustments to previous preliminary estimates of Construction Cost indicated by changes in requirements or general market conditions.

**2.4.4** The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

#### 2.5 BIDDING OR NEGOTIATION PHASE

**2.5.1** The Architect, following the Owner's approval of the Construction Documents and of the latest preliminary estimate of Construction Cost, shall assist the Owner in obtaining bids or negotiated proposals and assist in awarding and preparing contracts for construction.

#### 2.6 CONSTRUCTION PHASE—ADMINISTRATION OF THE CONSTRUCTION CONTRACT

**2.6.1** The Architect's responsibility to provide Basic Services for the Construction Phase under this Agreement commences with the award of the Contract for Construction and terminates at the earlier of the issuance to the Owner of the final Certificate for Payment or 60 days after the date of Substantial Completion of the Work.

**2.6.2** The Architect shall provide administration of the Contract for Construction as set forth below and in the xxxxxxxx xxxxxxxxxxxxxxxxxxxx General Conditions of the Contract for Construction, current as of the date of this Agreement, unless otherwise provided in this Agreement.

**2.6.3** Duties, responsibilities and limitations of authority of the Architect shall not be restricted, modified or extended without written agreement of the Owner and Architect with xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxx xxxxxxxx.

**2.6.4** The Architect ~~shall be a representative of and~~ shall advise and consult with the Owner (1) during construction until final payment to the Contractor is due, and (2) as an Additional Service at the Owner's direction from time to time during the correction period described in the Contract for Construction. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written instrument. The Architect is not an employee of the Owner.

**2.6.5** The Architect shall visit the site at intervals appropriate to the stage of construction or as otherwise agreed by the Owner and Architect in writing to become generally familiar with the progress and quality of the Work completed and to determine in general if the Work is being performed in a manner indicating that the Work when completed will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of on-site observations as an architect, the Architect shall keep the Owner informed of the progress and quality of the Work, and shall endeavor to guard the Owner against defects and deficiencies in the Work. *(More extensive site representation may be agreed to as an Additional Service, as described in Paragraph 3.2.)*

**2.6.6** The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction. The Architect shall not be responsible for the Contractor's schedules or failure to carry out the Work in accordance with the Contract Documents. The Architect shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.

**2.6.7** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**2.6.8** ~~Except as may otherwise be provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall communicate through the Architect. Communications by and with the Architect's consultants shall be through the Architect.~~

**2.6.9** Based on the Architect's observations and evaluations of the Contractor's Applications for Payment, the Architect shall review and certify the amounts due the Contractor.

**2.6.10** The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's observations at the site as provided in Subparagraph 2.6.5 and on the data comprising the Contractor's Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to minor deviations from the Contract Documents correctable prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment shall further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or

quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.6.11** The Architect shall have authority to reject Work which does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable for implementation of the intent of the Contract Documents, the Architect will have authority to require additional inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons performing portions of the Work.

**2.6.12** The Architect shall review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given, and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay in the Work or in the construction of the Owner or of separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities or for substantiating instructions for installation or performance of equipment or systems designed by the Contractor, all of which remain the responsibility of the Contractor to the extent required by the Contract Documents. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

**2.6.13** The Architect shall prepare Change Orders and Construction Change Directives, with supporting documentation and data if deemed necessary by the Architect as provided in Subparagraphs 3.1.1 and 3.3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**2.6.14** The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive and forward to the Owner for the Owner's review and records written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.

*Left margin (rotated):* Owner shall advise Architect in writing of any communication between Owner and Contractor during the term of this agreement within 14 days

*Left margin (rotated):* any such communication reasonably performed

*Right margin (rotated):* and shall immediately inform Owner upon ascertaining the existence of any shuch nonconforming wo[rk]

**2.6.15** The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under the requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon.

**2.6.16** Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.

**2.6.17** The Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.

**2.6.18** The Architect shall render written decisions within a reasonable time on all claims, disputes or other matters in question between the Owner and Contractor relating to the execution or progress of the Work as provided in the Contract Documents.

**2.6.19** The Architect's decisions on claims, disputes or other matters, including those in question between the Owner and Contractor, except for those relating to aesthetic effect as provided in Subparagraph 2.6.17, shall be subject to arbitration as provided in this Agreement and in the Contract Documents.

## ARTICLE 3
## ADDITIONAL SERVICES

### 3.1    GENERAL

**3.1.1** The services described in this Article 3 are not included in Basic Services unless so identified in Article 12, and they shall be paid for by the Owner as provided in this Agreement, in addition to the compensation for Basic Services. The services described under Paragraphs 3.2 and 3.4 shall only be provided if authorized or confirmed in writing by the Owner. If services described under Contingent Additional Services in Paragraph 3.3 are required due to circumstances beyond the Architect's control, the Architect shall notify the Owner prior to commencing such services. If the Owner deems that such services described under Paragraph 3.3 are not required, the Owner shall give prompt written notice to the Architect. If the Owner indicates in writing that all or part of such Contingent Additional Services are not required, the Architect shall have no obligation to provide those services.

### 3.2    PROJECT REPRESENTATION BEYOND BASIC SERVICES

**3.2.1** If more extensive representation at the site than is described in Subparagraph 2.6.5 is required, the Architect shall provide one or more Project Representatives to assist in carrying out such additional on-site responsibilities.

**3.2.2** Project Representatives shall be selected, employed and directed by the Architect, and the Architect shall be compensated therefor as agreed by the Owner and Architect. The duties, responsibilities and limitations of authority of Project Representatives shall be as described in the edition of AIA Document B352 current as of the date of this Agreement, unless otherwise agreed.

**3.2.3** Through the observations by such Project Representatives, the Architect shall endeavor to provide further protection for the Owner against defects and deficiencies in the Work, but the furnishing of such project representation shall not modify the rights, responsibilities or obligations of the Architect as described elsewhere in this Agreement.

### 3.3    CONTINGENT ADDITIONAL SERVICES

**3.3.1** Making revisions in Drawings, Specifications or other documents when such revisions are:

.1    inconsistent with approvals or instructions previously given by the Owner, including revisions made necessary by adjustments in the Owner's program or Project budget;

.2    required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents; or

.3    due to changes required as a result of the Owner's failure to render decisions in a timely manner.

**3.3.2** Providing services required because of significant changes in the Project including, but not limited to, size, quality, complexity, the Owner's schedule, or the method of bidding or negotiating and contracting for construction, except for services required under Subparagraph 5.2.5.

**3.3.3** Preparing Drawings, Specifications and other documentation and supporting data, evaluating Contractor's proposals, and providing other services in connection with Change Orders and Construction Change Directives.

**3.3.4** Providing services in connection with evaluating substitutions proposed by the Contractor and making subsequent revisions to Drawings, Specifications and other documentation resulting therefrom.

**3.3.5** Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.

**3.3.6** Providing services made necessary by the default of the Contractor, by major defects or deficiencies in the Work of the Contractor, or by failure of performance of either the Owner or Contractor under the Contract for Construction.

**3.3.7** Providing services in evaluating an extensive number of claims submitted by the Contractor or others in connection with the Work.

**3.3.8** Providing services in connection with a public hearing, arbitration proceeding or legal proceeding except where the Architect is party thereto.

**3.3.9** Preparing documents for alternate, separate or sequential bids or providing services in connection with bidding, negotiation or construction prior to the completion of the Construction Documents Phase.

### 3.4    OPTIONAL ADDITIONAL SERVICES

**3.4.1** Providing analyses of the Owner's needs and programming the requirements of the Project.

**3.4.2** Providing financial feasibility or other special studies.

**3.4.3** Providing planning surveys, site evaluations or comparative studies of prospective sites.

3.4.4 Providing special surveys, environmental studies and submissions required for approvals of governmental authorities or others having jurisdiction over the Project.

3.4.5 Providing services relative to future facilities, systems and equipment.

3.4.6 Providing services to investigate existing conditions or facilities or to make measured drawings thereof.

3.4.7 Providing services to verify the accuracy of drawings or other information furnished by the Owner.

3.4.8 Providing coordination of construction performed by separate contractors or by the Owner's own forces and coordination of services required in connection with construction performed and equipment supplied by the Owner.

3.4.9 Providing services in connection with the work of a construction manager or separate consultants retained by the Owner.

3.4.10 Providing detailed estimates of Construction Cost.

3.4.11 Providing detailed quantity surveys or inventories of material, equipment and labor.

3.4.12 Providing analyses of owning and operating costs.

3.4.13 Providing interior design and other similar services required for or in connection with the selection, procurement or installation of furniture, furnishings and related equipment.

3.4.14 Providing services for planning tenant or rental spaces.

3.4.15 Making investigations, inventories of materials or equipment, or valuations and detailed appraisals of existing facilities.

3.4.16 Preparing a set of reproducible record drawings showing significant changes in the Work made during construction based on marked-up prints, drawings and other data furnished by the Contractor to the Architect.

3.4.17 Providing assistance in the utilization of equipment or systems such as testing, adjusting and balancing, preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

3.4.18 Providing services after issuance to the Owner of the final Certificate for Payment, or in the absence of a final Certificate for Payment, more than 60 days after the date of Substantial Completion of the Work.

3.4.19 Providing services of consultants for other than architectural, structural, mechanical and electrical engineering portions of the Project provided as a part of Basic Services.

3.4.20 Providing any other services not otherwise included in this Agreement or not customarily furnished in accordance with generally accepted architectural practice.


## ARTICLE 4

## OWNER'S RESPONSIBILITIES

4.1 The Owner shall provide full information regarding requirements for the Project, including a program which shall set forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, flexibility, expandability, special equipment, systems and site requirements.

4.2 The Owner shall establish and update an overall budget for the Project, including the Construction Cost, the Owner's other costs and reasonable contingencies related to all of these costs.

4.3 ~~If requested by the Architect, the Owner shall furnish evidence that financial arrangements have been made to fulfill the Owner's obligations under this Agreement.~~

4.4 The Owner shall designate a representative ~~authorized to act on the Owner's behalf~~ with respect to the Project. The Owner or such authorized representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

4.5 The ~~Owner~~ Architect shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data pertaining to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a project benchmark.

4.6 The Owner ~~shall~~ will furnish the services of geotechnical engineers when such services are requested by the Architect. Such services may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate professional recommendations. Written approval by Owner shall be required prior to any such work.

4.6.1 The Owner shall furnish the services of other consultants when such services are reasonably required by the scope of the Project and are requested by the Architect. Written approval by Owner shall be required prior to any such work.

4.7 The Owner shall furnish structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports required by law or the Contract Documents.

4.8 The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by or on behalf of the Owner.

4.9 The services, information, surveys and reports required by Paragraphs 4.6 through 4.8 shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

4.10 Prompt written notice shall be given by the Owner to the Architect if the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents.

4.11 The proposed language of certificates or certifications requested of the Architect or Architect's consultants shall be submitted to the Architect for review and approval at least 14 days prior to execution. The Owner shall not request certifications that would require knowledge or services beyond the scope of this Agreement. Architect shall not unreasonably refuse to execute such certifications.

AIA DOCUMENT B141 • OWNER-ARCHITECT AGREEMENT • FOURTEENTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

## ARTICLE 5
## CONSTRUCTION COST

### 5.1    DEFINITION

**5.1.1** The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**5.1.2** The Construction Cost shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, plus a reasonable allowance for the Contractor's overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work during construction.

**5.1.3** Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, financing or other costs which are the responsibility of the Owner as provided in Article 4.

### 5.2    RESPONSIBILITY FOR CONSTRUCTION COST

**5.2.1** Evaluations of the Owner's Project budget, preliminary estimates of Construction Cost and detailed estimates of Construction Cost, if any, prepared by the Architect, represent the Architect's best judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's Project budget or from any estimate of Construction Cost or evaluation prepared or agreed to by the Architect.

**5.2.2** No fixed limit of Construction Cost shall be established as a condition of this Agreement by the furnishing, proposal or establishment of a Project budget, unless such fixed limit has been agreed upon in writing and signed by the parties hereto. If such a fixed limit has been established, the Architect shall be permitted to include contingencies for design, bidding and price escalation, to determine what materials, equipment, component systems and types of construction are to be included in the Contract Documents, to make reasonable adjustments in the scope of the Project and to include in the Contract Documents alternate bids to adjust the Construction Cost to the fixed limit. Fixed limits, if any, shall be increased in the amount of an increase in the Contract Sum occurring after execution of the Contract for Construction.

**5.2.3** If the Bidding or Negotiation Phase has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, any Project budget or fixed limit of Construction Cost shall be adjusted to reflect changes in the general level of prices in the construction industry between the date of submission of the Construction Documents to the Owner and the date on which proposals are sought.

**5.2.4** If a fixed limit of Construction Cost (adjusted as provided in Subparagraph 5.2.3) is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

.1  give written approval of an increase in such fixed limit;

.2  authorize rebidding or renegotiating of the Project within a reasonable time;

.3  if the Project is abandoned, terminate in accordance with Paragraph 8.3; or

.4  cooperate in revising the Project scope and quality as required to reduce the Construction Cost.

**5.2.5** If the Owner chooses to proceed under Clause 5.2.4.4, the Architect, without additional charge, shall modify the Contract Documents as necessary to comply with the fixed limit, if established as a condition of this Agreement. The modification of Contract Documents shall be the limit of the Architect's responsibility arising out of the establishment of a fixed limit. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced. ~~previously~~

## ARTICLE 6
## USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**6.1** The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project and, unless otherwise provided, the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright. The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by ~~others~~, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

**6.2** Submission or distribution of documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

## ARTICLE 7
## ARBITRATION

**7.1** Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise.

**7.2** Demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

**7.3** No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement,

*architectural services of other providers*

except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

7.4  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 8

### TERMINATION, SUSPENSION OR ABANDONMENT

8.1  This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

(Not caused by Architects breach)

8.2  If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect's compensation shall be equitably adjusted to provide for expenses incurred in the interruption and resumption of the Architect's services.

8.3  This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect in the event that the Project is permanently abandoned. If the Project is abandoned by the Owner for more than 90 consecutive days, the Architect may terminate this Agreement by giving written notice.

8.4  Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination.

8.5  If the Owner fails to make payment when due the Architect for services and expenses, the Architect may, upon seven 30 days' written notice to the Owner, suspend performance of services under this Agreement. Unless payment in full is received by the Architect within seven days of the date of the notice, the suspension shall take effect without further notice. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services.

8.6  In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Paragraph 8.7.

8.7  Termination Expenses are in addition to compensation for Basic and Additional Services, and include expenses which are directly attributable to termination. Termination Expenses shall be computed as a percentage of the total compensation for Basic Services and Additional Services earned at the time of termination, as follows:

.1  Twenty percent of the total compensation for Basic and Additional Services earned to date if termination occurs before or during the predesign, site analysis, or Schematic Design Phases; or

.2  Ten percent of the total compensation for Basic and Additional Services earned to date if termination occurs during the Design Development Phase; or

.3  Five percent of the total compensation for Basic and Additional Services earned to date if termination occurs during any subsequent phase.

## ARTICLE 9

### MISCELLANEOUS PROVISIONS

9.1  Unless otherwise provided, this Agreement shall be governed by the law of the principal place of business of the Architect. State of Illinois.

9.2  Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

9.3  Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

9.4  The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

9.5  The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Owner nor Architect shall assign this Agreement without the written consent of the other.

9.6  This Agreement represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

9.7  Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

9.8  Unless otherwise provided in this Agreement, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances.

9.9  The Architect shall have the right to include representations of the design of the Project, including photographs of the exterior and interior, among the Architect's promotional and professional materials. The Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of

*[Rotated marginal text:]* the Architect's hourly rate to get the state of development when the project was stopped

AIA DOCUMENT B141 • OWNER-ARCHITECT AGREEMENT • FOURTEENTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect on the construction sign and in the promotional materials for the Project.

## ARTICLE 10

### PAYMENTS TO THE ARCHITECT

#### 10.1   DIRECT PERSONNEL EXPENSE

**10.1.1** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

#### 10.2   REIMBURSABLE EXPENSES

**10.2.1** Reimbursable Expenses are in addition to compensation for Basic and Additional Services and include expenses incurred by the Architect and Architect's employees and consultants in the interest of the Project, as identified in the following Clauses.

**10.2.1.1** Expense of transportation in connection with the Project; expenses in connection with authorized out-of-town travel; long-distance communications;~~XXXXXXXXXXXXXXXXXXXX~~ ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~

**10.2.1.2** Expense of reproductions, postage and handling of Drawings, Specifications and other documents.

**10.2.1.3** If authorized in advance by the Owner, expense of overtime work requiring higher than regular rates.

**10.2.1.4** Expense of renderings, models and mock-ups requested by the Owner.

**10.2.1.5** Expense of additional insurance coverage or limits, including professional liability insurance, requested by the Owner in excess of that normally carried by the Architect and Architect's consultants.

**10.2.1.6** Expense of computer-aided design and drafting equipment time when used in connection with the Project.

#### 10.3   PAYMENTS ON ACCOUNT OF BASIC SERVICES

**10.3.1** An initial payment as set forth in Paragraph 11.1 is the minimum payment under this Agreement.

**10.3.2** ~~Subsequent~~ payments for Basic Services shall be made monthly and, where applicable, shall be in proportion to services performed within each phase of service, on the basis set forth in Subparagraph 11.2.2.

**10.3.3** If and to the extent that the time initially established in Subparagraph 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Subparagraph 11.3.2.

**10.3.4** When compensation is based on a percentage of Construction Cost and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions, in accordance with the schedule set forth in Subparagraph 11.2.2, based on (1) the lowest bona fide bid or negotiated proposal, or (2) if no such bid or proposal is received, the most recent preliminary estimate of Construction Cost or detailed estimate of Construction Cost for such portions of the Project.

#### 10.4   PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES

**10.4.1** Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement of services rendered or expenses incurred.

#### 10.5   PAYMENTS WITHHELD

**10.5.1** No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work other than those for which the Architect has been found to be liable.

#### 10.6   ARCHITECT'S ACCOUNTING RECORDS

**10.6.1** Records of Reimbursable Expenses and expenses pertaining to Additional Services and services performed on the basis of a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

## ARTICLE 11

### BASIS OF COMPENSATION

The Owner shall compensate the Architect as follows:

**11.1**   AN INITIAL PAYMENT of  \*\*\*\*\*\*\*\*\*\*zero\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*  Dollars ($ 0.00                    ) shall be made upon execution of this Agreement and credited to the Owner's account at final payment.

#### 11.2   BASIC COMPENSATION

**11.2.1** FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:

*(Insert basis of compensation, including stipulated sums, multiples or percentages, and identify phases to which particular methods of compensation apply, if necessary.)*

SEE APPENDIX A 11.2.1

~~11.2.2 Where compensation is based on a stipulated sum or percentage of Construction Cost, progress payments for Basic Services~~
~~in each phase shall total the following percentages of the total Basic Compensation payable:~~
~~(Insert additional phases as appropriate.)~~

| | |
|---|---|
| ~~Schematic Design Phase:~~ | ~~percent ( %)~~ |
| ~~Design Development Phase:~~ | ~~percent ( %)~~ |
| ~~Construction Documents Phase:~~ | ~~percent ( %)~~ |
| ~~Bidding or Negotiation Phase:~~ | ~~percent ( %)~~ |
| ~~Construction Phase:~~ | ~~percent ( %)~~ |

Total Basic Compensation:       one hundred percent (100%)

### 11.3 COMPENSATION FOR ADDITIONAL SERVICES

**11.3.1 FOR PROJECT REPRESENTATION BEYOND BASIC SERVICES,** as described in Paragraph 3.2, compensation shall be computed as follows:

SEE APPENDIX A 11.3.1

**11.3.2 FOR ADDITIONAL SERVICES OF THE ARCHITECT,** as described in Articles 3 and 12, other than (1) Additional Project Representation, as described in Paragraph 3.2, and (2) services included in Article 12 as part of Basic Services, but excluding services of consultants, compensation shall be computed as follows:

*(Insert basis of compensation, including rates and/or multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply, if necessary.)*
SEE APPENDIX A 11.3.2

**11.3.3 FOR ADDITIONAL SERVICES OF CONSULTANTS,** including additional structural, mechanical and electrical engineering services and those provided under Subparagraph 3.4.19 or identified in Article 12 as part of Additional Services, a multiple of one and ten hundreth (1.10) times the amounts billed to the Architect for such services, billed to Owner. Additional
*(Identify specific types of consultants in Article 12, if required.)*    services shall be approved by Owner prior to retention.

### 11.4 REIMBURSABLE EXPENSES

**11.4.1 FOR REIMBURSABLE EXPENSES,** as described in Paragraph 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of one and ten hundreth (1.10) times the expenses incurred by the Architect, the Architect's employees and consultants in the interest of the Project.

### 11.5 ADDITIONAL PROVISIONS

**11.5.1 IF THE BASIC SERVICES** covered by this Agreement have not been completed within \*\*\*\*twelve\*\*\*\*\*\*\*\*\*\*\*\* ( 12 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

**11.5.2** Payments are due and payable \*\*\*\*\*20\*\*\*\*\*\*\*\*\*\*\* ( 20 ) days from the date of the Architect's invoice. Amounts unpaid \*\*\*\*\*\*\*thirty\*\*\*\*\* ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)* 1.5% per month, 18% per year. No interest shall accrue on payments which are lawfully withheld.
*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

AIA DOCUMENT B141 • OWNER-ARCHITECT AGREEMENT • FOURTEENTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

11.5.3 ~~The~~ ~~Gites~~ ~~and~~ ~~making~~ ~~corrections~~ ~~for~~ ~~Additional~~ ~~Services~~ ~~shall~~ ~~be~~ ~~compensated~~ ~~as~~ ~~provided~~ ~~in~~ ~~Sections~~ ~~11.1.2~~ ~~Completion~~ ~~procedure~~ ~~of~~ ~~reimbursement~~

## ARTICLE 12
## OTHER CONDITIONS OR SERVICES

*(Insert descriptions of other services, identify Additional Services included within Basic Compensation and modifications to the payment and compensation terms included in this Agreement.)*

SEE APPENDIX A ARTICLE 12

This Agreement entered into as of the day and year first written above.

OWNER                                    ARCHITECT

_____                  _____
*(Signature)*                            *(Signature)*

RICHARD A. HELWIG, CITY MGR.             David F. Burbach          Owner
*(Printed name and title)*               *(Printed name and title)*

AIA DOCUMENT B141 • OWNER-ARCHITECT AGREEMENT • FOURTEENTH EDITION • AIA® • ©1987
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C 20006

"APPENDIX A"

ARTICLE 11

11   BASIS OF COMPENSATION

11.1   As noted in the Standard Form "Zero Dollars ($0)".

11.2   BASIC COMPENSATION

11.2.1 FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:

Phase I:

Task #1 (Technical Evaluation of both facilities)  and

Task #2 (Replacement/Enhancement of both facilities) -          $ 6,800.00
Reimbursables for Phase I shall not exceed $2,000.00,
without written authorization from the Owner.

Phase II

Compensation for basic services for Phase II (Design Development and Construction Documents Phase) and for all add alternates shall be 7.75% of the construction costs plus reimbursables.

Reimbursables for Phase II shall not exceed $7,000 for repair or $8,000.00 for replacement, per project, without written authorization from the Owner.

Phase III

Compensation for basic services for Phase III (Bidding or Negotiation Phase and Construction Phase) shall be 4% of the final construction costs plus reimbursable expenses for the scope of services as outlined in our Scope of Services included herein.

Reimbursables for Phase III shall not exceed $14,000 for repair or $18,000 for replacement, per project, without written authorization from the Owner.

Please note that Phase II and Phase III services performed by the Architect, for construction work to be performed by the Owner will be considered Additional Services.

11.2.2 As noted on the Standard Form.

## 11.3 COMPENSATION FOR ADDITIONAL SERVICES

11.3.1 Compensation for additional services shall be based on Expense Schedule for Additional Services and Reimbursables according to ATTACHMENT "A" as amended.

11.3.2 One public bidding is included in Basic Services. Additional services required for additional public bidding shall be based on a Expense Schedule for Additional Services and Reimbursables basis according to ATTACHMENT "A" as amended.

12    ARTICLE 12 - OTHER CONDITIONS OR SERVICES

12.1   DEFINITIONS

12.1.1 Wherever the word "Architect" is used in the AIA Document B141, Standard Form of Agreement Between Owner and Architect, Edition 1987, as amended, the word "Engineer" shall be substituted.

12.2   Limitations of Liability

12.2.1 Compensation.    Neither the Architect, the Architect's consultants, nor their agents or employees shall be jointly, severally or individually liable to the owner in excess of One million dollars ($1,000,000), by reason of any act or omission, including breach of contract or negligence not amounting to a willful or intentional wrong.

12.3   Changes in Standard Form of Agreement Between Owner and Architect.

12.3.1 Article 1 shall be amended to include the following:

The Architect shall furnish and perform professional services as authorized and directed by the Owner's authorized representative. Such authorization and direction shall be confirmed by letter. By giving such authorization or direction, the Owner thereby warrants to the architect that sufficient funds to pay the Architect for their services have been or will be appropriated in a timely manner for that purpose.

12.3.2 Article 2.2 Schematic Design Phase shall be deleted and replace with the following:

Scope of Services shall be work included in PHASE I - FEASIBILITY STUDY as listed in "Appendix B" (attached).

12.3.3 Article 2.3   Design Development Phase and Article 2.4 Construction Document Phase shall be amended to included the following:

14

Scope of Services shall be work included in PHASE II - DESIGN AND PLANNING SERVICES as listed in "Appendix B" (attached).

12.3.4 Article 2.5 Bidding and Negotiating Phase and Article 2.6 Construction Phase-Administration of the Construction Contract, Phase III service shall be amended to included the following:

Scope of Services shall be work included in PHASE III - CONSTRUCTION RELATED SERVICES as listed in "Appendix B" (attached).

12.3.5 Article 3.4.19 shall be replaced with the following:

"Providing services of consultants for other than aquatics, architectural, structural, mechanical and electrical engineering provided as a part of Basic Services. No such services shall be provided without prior written authorization by Owner"

12.3.6 Article 4 shall be amended to include the following:

If the Architect is not notified in writing to the contrary within thirty (30) days after completion and delivery of the services authorized by the owner, they will be considered accepted as delivered.

12.3.7 Article 9 shall be amended to include:

The Owner and the Architect shall be bound by the terms of this Agreement for the life of the project which is through completion of construction of the Project. This is an exclusive contract for performance of all the consulting work on this project, including all phases of professional services as specified herein.

12.3.8 Article 9 shall be amended to include:

The Architect and the Owner agree that the overall liability for the actual, alleged, or threatened discharge, dispersal, release, or escapement of pollutants, and the responsibility for the ownership and maintenance of any toxic, hazardous, or asbestos materials relating to the project,

15

remain with the Owner. The Architect and the Owner acknowledge that the Architect's professional liability policy does not apply to claims arising out of the actual, alleged, or threatened discharge, dispersal, release, or escapement of pollutants. Therefore, the Owner, agrees not to bring a claim against the Architect relating to the uninsured liability referenced above.

Furthermore, the Owner agrees to indemnify and hold harmless the Architect for claims against the Architect by a third party for the uninsured liability referenced above. Provided however, the Architect agrees to perform the services to the normal accepted standard of care, and to assume the liability resulting from a finding of negligence.

12.3.9  Article 10.2 shall be amended to include:

That the rates set forth in ATTACHMENT A hereto are for only the calendar years indicated, and that said rates shall be subject to annual adjustment on submission by the Architect to the Owner of a new ATTACHMENT A, and that upon receipt by the Owner, the rates in the new ATTACHMENT A shall supersede those in all previous forms of ATTACHMENT A. Provided however, that such new rates shall not result in an increase in excess of 5% of the previous year's rates.

12.3.10  Article 11.4.1 shall be amended to reference "Schedule A" for basis of payment for reimbursable expenses.

16

"APPENDIX B"

## PROJECT APPROACH

This scope of services is the result of the March 11, 1994 request for qualifications and my meeting of September 29, 1994 with Ms. Bates regarding repair/replacement of the City of Elgin Wing Park Pool and Lords Park Pool. It would be our intent to complete the Phase I services during the fall and early winter of 1994. After which time we will work with the Owner to formulate short term repairs to both facilities. The next anticipated step is to prepare plans for more extensive work on both facilities with construction to occur during the fall and winter of 1995/96 with completion scheduled for May 15, 1996.

## FEASIBILITY STUDY - PHASE I

The following Work Tasks are recommended for incorporation as part of the feasibility study. The Tasks are as follows:

## TASK #1 - Technical Evaluation Of Existing Facilities

1. Perform a detailed on-site engineering review (technical evaluation) of the outdoor existing pools (Wing Park Pool and Lords Park Pool); catalog significant Code defects; and catalog repairs necessary to restore the facility to good repair and Code compliance.

2. Perform a technical evaluation of the existing plant which could be reused or incorporated into a repair, modernization and/or replacement of the facility.

3. Analyze need, provide opinions of probable cost and submit recommendations for the pool shell, surge area, piping systems, filter system, recirculation pump, chemical system, pool heater, deck equipment, sanitary facilities, bathhouse area, bathhouse roofs, ADA review, potable water system, process piping system, addition of site amenities, addition of income generating amenities, etc. Please note that in our evaluation process we will break each facility into 33 different categories, all of which will be responded to in the above manner.

4. Make overall final recommendations outlining any recommended improvements to the facility and provide six copies of the final report.

5. Provide opinions of probable construction cost to complete the recommended

work.

6. Provide a schedule of implementation of the construction work.

7. A total of two meetings would be provided.

## TASK #2 - Develop Modernization/Replacement Program

If after completion of the above Task I, it becomes apparent that the pool vessels
will require replacement and/or major work or if there is a desire to convert the
traditional facilities into recreation type pools, then we recommend completion of
Task II of our feasibility study which will take a broader approach to the problem.
Work for this Task would include developing two modernization and/or replacement
scenarios for each of the outdoor facilities for the purpose of either replacing or
modernizing each facility, reducing the operating and maintenance deficit and
increasing community acceptance of the facilities.  This portion of the study would
address such items as location, your total aquatic system programming needs,
probable construction costs, probable operating cost, determination of the type and
configuration of pool facility to best meet the community's needs, code compliance,
type of improvements and establishment of a project concept.  The following is a
detailed description of the work which we would perform for this part of the
feasibility study:

1.  Perform a technical analysis of each existing outdoor pool site.  Our firm has
developed rigid technical review requirements in which 17 categories of analyses
are provided for each site, including field check of elevations and existing utilities,
effect on surrounding neighbors, traffic patterns, accessibility for the users, etc.

2.   Review projections of the City's demographic trends and analyze recent
swimming pool usage data and advise on the demand for aquatics in the City.

3.  Perform a marketing study including evaluation of surrounding aquatic facilities
highlighting their relative strengths and programming.  We would then perform a
detailed aquatic sizing resulting in the necessary water surface area required to meet
the communities needs for the next 25 years.

4.  Review present programming with staff, determine optimum programming needs
and define which facilities can best handle those needs.  Develop a system wide
approach to meeting the communities aquatic needs.

5.  The next step in the development of this project would be to prepare conceptual
drawings of facilities intended to meet the community's demands utilizing as much
of the existing plant as practical and possible.   Two conceptual layouts of

18

modernization/replacement (recreational) facilities would be prepared. Site amenities, new recreation pools and other assets will be addressed. An informative process would be undertaken by the consultant which would involve slide presentations to the appropriate committees illustrating different types of facilities and their respective uses. One of the goals of Burbach Municipal and Civil Engineers is to maintain a close team approach so as to assist our clients as the project develops.

6. Individual components of each of the proposed facilities would be analyzed and recommendations would be put forth addressing issues such as maintenance, probable operating costs, and overall impact on the quality of the aquatic environment and impact on the existing facility. Since we specialize in the design of municipal pools, both neighborhood and community, we have an excellent working knowledge of the equipment and mechanical apparatus and assemblies which should be provided and installed in facilities such as these.

7. Provide opinions of probable construction costs and make recommendations for the pool shells, surge tanks, piping systems, filter systems, recirculation pumps, chemical systems, pool heaters, wading pools, deck equipment, sanitary facilities, site amenities, bathhouses, mechanical buildings, and other items for a total of 33 categories.

8. The probable financial performance of the two alternates will then be prepared. Our firm maintains an extensive database of pool operating costs, revenues, etc. for many different and varied communities in the midwestern United States. From this information base, we are able to provide probable operating and maintenance costs and projections. Maintenance and operating costs should be factored into the total cost of enhanced aquatic facilities for the City of Elgin.

9. Make overall final recommendations regarding the type and size facility, extent to which existing facilities can be reused, site amenities, location, etc, and provide six copies of the report.

10. Present findings to the City and various community groups. A total of three meetings would be included.

19

# PHASE II - DESIGN AND PLANNING SERVICES

1.  Perform site surveying including elevations and locations for one site for the new facility (THE PROJECT).  The site will be selected by the Owner;

2.  Prepare site layout for the PROJECT located on a site that has been selected by the Owner.  The primary objective of this task is to prepare one preliminary site layout, and one detailed final site plan on the chosen site, detailing the location of major facilities for the project with the result being a Owner approved site layout.  This work will be based on the conceptual site plan developed in Phase I.  While performing this task, we will meet with the client to ensure that the final detailed site plan conforms to the intent of the conceptual site plan and the needs of the Owner;

3.  Evaluate soil borings excavated by the Owner, and/or coordinate with the Owner's testing consultant, separately contracted for by the Owner, in the event detailed soil borings and testing are necessary;

4.  Preparation of preliminary pool plans.  The primary objective of this task is to work in concert with the Owner to develop a configuration of the pool, along with the relationship to the selected site amenities, and along the lines of the concept established in the feasibility study, with the result being a Owner approved pool vessel foot print;

5.  Preparation of preliminary bathhouse plans.  The primary objective of this task is to work in concert with the Owner to develop a configuration of the bathhouse, along the lines of the concept established in the feasibility study, with the result being a Owner approved preliminary bathhouse plan;

6.  We will carefully monitor the opinion of probable costs developed during the feasibility study phase to as to maintain help the established budget. of the project;

7.  Preparation of final pool plans.  The purpose of this task is to design the swimming pool based on the approved preliminary drawing.  Structural design and construction details will be prepared at this time;

8.  Preparation of final bathhouse renovation plans.  The purpose of this task is to produce construction drawings for bidding purposes, including the design and layout of the bathhouse, based on the approved preliminary drawings;

9.  Preparation of bathhouse mechanical.  Work to be performed under this task includes design of plumbing systems, HVAC, equipment selection, drafting and

preparation of plans for bidding purposes;

10. Preparation of pool mechanical. The purpose of this task is to design and draft the complete recirculation system for the all new pool vessel, complete the design of the mechanical building and surge tank, along with structural engineering and construction details. Another purpose of this task is to design, specify and draft the pool mechanical equipment including subsystems supporting site amenities;

11. Preparation of electrical plans. Work to be performed under this task includes electrical layout and design for site improvements, and for the process equipment in the new mechanical room addition, and preparation of plans for bidding purposes;

12. Preparation of plans for site amenities as chosen by the Owner. Work to be performed under this task includes specialized mechanical systems such as rim flow devices, body spray; specialized construction techniques for landscaping relief; specialized landscaping for site amenities; water slide, umbrella fountain, and water play features as may be incorporated by the Owner;

13. Preparation of project specifications, contract and bidding documents. The purpose of this task is to prepare proposal forms, general requirements of the contract, specifications and equipment specifications so as to produce what is commonly referred to as a Project Manual;

14. Print up to a total of three preliminary plan sets and three project manuals for client review during the plan development process;

15. Review Agency Submittal. Work to be performed under this task includes making application to the Department of Health for the plumbing system, process piping system, bathhouse and swimming pool. All state and local review fees shall be paid directly by the Owner;

16. Owner Approval. The purpose of this task is to summarize the plans and specifications and receive direction from the Owner with regard to specific contract language regarding completion dates, time of completion, etc.; provide presentations and review of the completed documents with the committees and staff and attend up to three meetings for the purpose of plan development and presentation of plans;

17. The Owner shall provide any available original plans, aerial survey maps and plans, and topographic maps. Property surveys and establishment of actual public right-of-ways are not part of the specified work.

# PHASE III - CONSTRUCTION RELATED SERVICES

    1.  A pre-bid meeting shall be conducted by the ENGINEER and he will conduct a Contractor Awareness Program in the City of Elgin;

    2. ENGINEER will answer contractor questions during the bidding stage and issue addendums accordingly;

    3. ENGINEER will conduct the public bid opening and shall make a written recommendation regarding the successful contractor;

    4. Contracts - the ENGINEER shall prepare contracts in triplicate, have them executed by the successful bidders and then submit them to the Owner;

    5.  Preconstruction meeting - the ENGINEER shall arrange and conduct a preconstruction meeting;

    6.  On-site observation and Progress Meetings

        a.    The ENGINEER will perform on-site observation as the construction work progresses, review and advise the Owner of test results, reject defective work and advise the Owner of special tests or inspections needed as Additional Service.   When concrete is being placed in the pool vessel, the ENGINEER will continuously observe the placement of the concrete and also pre-check the steel placement and observe piping pressure tests for the swimming pool.

        b.  The ENGINEER will conduct and attend construction progress meetings for the purpose of observing the progress of the contractor's work, discuss problems, answer questions and review the contractor's planning of future construction work.

        c.  The ENGINEER will make a total of 14 trips to Elgin for on-site observation and progress meetings. Progress meetings should be scheduled with on-site observations.  In addition to the 14 trips are one pre-bid meeting, one public bid opening, one preconstruction meeting, one substantial completion on-site and one final on-site observation.  Any and all other trips will be performed as Additional Service;

    7.  Notification of Nonconformance - the ENGINEER will notify the Owner of any work which does not conform to the intent of the construction contract as part of the ENGINEER'S basic services. As Additional Service, the ENGINEER will make recommendations to the Owner for the correction of nonconforming work and, at the request of the Owner, direct that these recommendations are

22

implemented by the contractor.  This Additional Service may, at the discretion of the Owner, be deducted from the responsible contractor's contract amount due;

8. Shop Drawings - the ENGINEER will review shop drawings to determine any objections;

9. Contractor Payment Requests - the ENGINEER will review the requests of the contractor for monthly progress payments and will recommend to the Owner, based on site observations, whether or not such request is commensurate with the work completed;

10. Change Orders - the ENGINEER will review and recommend written change orders for approval by the Owner;

11. Substantially Complete and Final on-site observation - the ENGINEER will perform one on-site observation to determine if the project is substantially complete and one final on-site observation to determine if the project is finally complete according to the construction contract and whether final payment should be made. If additional on-site observations are necessary, they will be performed as Additional Service.  This Additional Service may, at the discretion of the Owner, be deducted from the responsible contractor's contract amount due.

## ATTACHMENT A

### Expense Schedule for Additional Service and

### Reimbursables for Calendar Years 1995 and 1996

Civil Engineers: $70.00/hour
Engineering Technicians: $35.00/hour
Secretarial: $25.00/hour
Mileage: each way @ $0.35/mile
Computer usage: $10.00/hour
Plan copies (24x36 mylar): $8.00 per sheet
Plan copies (24x36 bond): $4.00 per sheet
Plan copies (24x36 blue line): $1.50 per sheet
Standard 8.5x11 Copies: $0.25/sheet
Colored 8.5x11 Copies: $4.00/sheet
Standard 8.5x11 Overlays: $2.00/sheet
Telephone charges: actual
Shipping/Postage: actual
Photo record: $1.00/photograph, $5.00/camcorder session
Fax charges: $4.00/first sheet, $2.00/thereafter, $1.00/sheet incoming
Meals: $5.00/breakfast, $6.00/lunch, $9.00/dinner
Lodging: $50.00/night
Subconsultants/testing: actual
Other charges as stated in Article 10.2

State and local plan review fees are not included with any of the above, and shall be paid by the Owner.

24